468    Price v. Planters National Bank.    [92

# Richmond.

PRICE, &C., BY, &C. V. PLANTERS NATIONAL BANK AND OTHERS.

JANUARY 16, 1896.

1. SEPARATE ESTATE—*Powers of Wife—Liability for Debts.*—Where property is settled to the separate use of a married woman, and power is given to her, expressly or impliedly, to deal with it, she has the incidental power of contracting debts on the faith and credit of it, and a court of equity will lay hold of the property and subject it to the payment of said debts.

2. SEPARATE ESTATE—*Mode of Alienation Where One Mode Prescribed.*—Though the instrument creating a separate estate prescribe one mode of alienation, this is not to be construed as excluding all other modes of alienation, unless such intent can be clearly gathered from the face of the instrument.

3. SEPARATE ESTATE—*Restraint on Alienation—Wife's Contracts—Presumption.*—When a separate estate is created, the settler may impose restraints, absolute or qualified, on the wife's power of alienation, and effect will be given to the intention to restrain, whether it be expressed or implied, if such intention be clear. But in the absence of such restraint, the wife's contracts will be presumed, as matter of law, to have been made with reference to such separate estate as she owned at the time of entering into the contract, unless a contrary intention be expressed in the contract.

4. SEPARATE ESTATE—*What it May Consist of.*—Property of every kind, real or personal, and any interest therein, may be settled or held to the wife's separate use. Her equitable separate estate may include estates in fee in lands, in possession, or reversion, life estates, estates for years, things in action, securities, specific chattels, or money. It may consist of any property, and of any interest therein.

5. SEPARATE ESTATE—*How Far Liable for Debts—Liability After Coverture—Liability of Corpus of Real Estate.*—If a married woman holds an equitable separate estate, free from restraint on her power of alienation, it may be subjected to the payment of her general engagements to the extent of her powers over it. The separate

estate of the wife is liable for her engagements created during the coverture, as well after the termination of the coverture as before, unless the estate is determined by the particular event that terminates the coverture. If there is no separate personal estate, or not sufficient to pay the debts, and there is an equitable separate estate consisting of a fee in lands, the rents and profits of which will not discharge the debts of the wife in a reasonable time, then the *corpus* of the land itself, or so much thereof as is necessary, may be subjected by sale.

Appeal from a decree of the Chancery Court of the city of Richmond, pronounced January 24, 1895, in a suit in chancery wherein the Planters National Bank of Richmond, suing for itself and others, was the complainant, and appellants and others were the defendants.

*Affirmed.*

This was a suit in chancery instituted in the Chancery Court of the city of Richmond for the purpose of subjecting the estate of Mary Triplett Haxall, deceased, to the payment of her debts. Mary Triplett Haxall was, at the time of her death, the wife of Philip Haxall, and owned an equitable separate estate in fee in a house and lot in the city of Richmond, worth about $30,000. This property was conveyed by Nannie J. Triplett, the mother of Mrs. Haxall, by deed bearing date July 18, 1885, to Barton Haxall, in trust for the sole and separate use of the said Mary Triplett Haxall. After receiving this conveyance, and during coverture, Mrs. Mary Triplett Haxall contracted large debts on the faith and credit of her separate estate. These debts were evidenced by negotiable notes, some of which were made by her, and others made by her husband and endorsed by her, but for her sole benefit.

The following is a copy of the deed under which Mrs. Haxall held the property now sought to be subjected :

" This deed, made this 18th day of July, 1885, between

Nannie J. Triplett, of the first part, and Barton Haxall, of the second part, and Mary Triplett Haxall, wife of Philip Haxall, of the third part—

"Witnesseth : That in consideration of the natural love and affection which she hath for her daughter, the said Mary Triplett Haxall, and of the sum of five dollars, the said Nannie J. Triplett doth grant and convey unto the said Barton Haxall the following property :

[The property is here described.]

"In trust, for the sole, separate, and exclusive use and benefit of the said Mary Triplett Haxall, free from the debts, contracts, control, management, and marital rights of the said Philip Haxall, or any future husband, with full power to said Barton Haxall, trustee, as aforesaid, to sell, exchange, convey in trust, mortgage, charge, or otherwise dispose of the said property whenever directed so to do by the said Mary Triplett Haxall, by a writing under her hand, attested by two witnesses, the proceeds of any disposition of said property of whatever kind to be turned over to the said Mary. Triplett Haxall, to do with the same as she may think proper, or said proceeds shall be invested or disposed of by the said Barton Haxall, trustee as aforesaid, in such manner as she may, in a writing attested by two witnesses, direct, and in no event shall any party coming into the possession of this property in any of the modes prescribed by this deed be bound to see to the application of the purchase money or proceeds arising from any disposition thereof made under the provisions of this deed.

"The said Barton Haxall, trustee as aforesaid, shall permit the said Mary Triplett Haxall to occupy, possess, and enjoy the said lot of land and any improvements placed thereon, and the rents, issues, and income thereof to take to her sole and separate use and dispose of as she may see fit.

"And the said Mary Triplett Haxall is hereby invested

with full power to dispose of the property hereby conveyed
by will, or paper testamentary in the nature of a will, and
should she leave such will or testamentary paper, then the
said property, or any which may have been substituted there-
for, shall go and pass to such person or persons, and in such
manner and proportions, as she shall thereby direct."

*Pegram & Stringfellow* and *Julian Bryant*, for the ap-
pellants.

*Christian & Christian*, for the Planters National Bank of
Richmond.

*A. W. Patterson*, for the Savings Bank of Richmond.

RIELY, J.

The liability of the equitable separate estate of a married
woman *after her death*, for her general engagements, is the
important question that confronts us in this case.   Is it liable
at all; and, if so, in what manner and to what extent?   This
precise question, so far as I am aware, has not heretofore been
directly presented to this court for decision.

The solution of this vexed question depends upon and must
be governed by the nature of the separate estate and the ex-
tent of the power of the married woman over it.

Whatever may have been the adjudications and judicial
expressions of the courts of England and of this State in the
past, it is now settled, both there and here, that where property
is settled to the separate use of a married woman, and the
power is given to her, expressly or impliedly, to deal with it,
she has the other power incident to property in general—
namely, the power of creating debts to be paid out of it; and
a court of equity will give effect to them, not as personal

liabilities, but by laying hold of the separate property and subjecting it to the payment of the debts contracted by her with reference to her separate property and upon the faith and credit of it. *Hulme* v. *Tenant*, 1 Bro. C. C. 16 (1 Leading Cases in Equity, p. 679); *Owens* v. *Dickinson*, 1 Cr. & Ph. 48; *Bank of Greensboro* v. *Chambers et als.*, 30 Gratt. 202; *Justis* v. *English et als.*, Id. 565; *Frank & Adler* v. *Lilienfeld et als.*, 33 Gratt. 377; *Bain & Bro.* v. *Buff's Adm'r et als.*, 76 Va. 371; and *Christian & Gunn* v. *Keen*, 80 Va. 369.

Where the instrument creating the separate estate prescribes one mode of alienation by the wife, the prescribing of that mode is not to be construed as an intention to exclude alienation by her in any other manner, unless an intention to do so can be clearly gathered from the face of the instrument. *Lee* v. *Bank of U. S.*, 9 Leigh 200; *Woodson, Trustee*, v. *Perkins*, 5 Gratt. 345; *Frank & Adler* v. *Lilienfeld et als.*, *supra*, and *Christian & Gunn* v. *Keen*, *supra*. This is said by Mr. Burks, in his admirable treatise on " Separate Estates," p. 38, to be the decided weight of authority, both English and American.

When the separate estate is created, it is, nevertheless, competent for the settler to indicate what shall be the extent of her control over it. He may, contrary to the course of the common law, impose restraint, either absolute or qualified, on her power of alienation, and his intention to restrain may be either express or implied, but in either case it must be clear. When such intention appears, or can be gathered from the whole instrument—the language used, the scheme of settlement, or the facts and circumstances of the particular case to be gathered from the instrument—equity will respect it and enforce the restraint that may be imposed. *Bain & Bro.* v. *Buff's Adm'r et als.*, *supra*; Burks' " Separate Estates," 33; and Bishop on the Law of Married Women, sec. 859.

And in the enforcement of the general engagements of a married woman having an equitable separate estate, when it is once established that the contract which it is sought to enforce is hers, it is presumed, as a matter of law, that she intended to make liable for it such separate estate as she owned, free from restraint, at the time of entering into the engagement, unless the contrary intention is expressed in the contract; and a court of equity will so subject it, or so much of it as may then be owned by her. Code of Va., sec. 2295; Burks? "Separate Estates," p. 86; *Frank & Adler* v. *Lilienfeld et als., supra; Pike* v. *Fitzgibbon,* Law. Rep. 173, Ch. Div. 454; and Pomeroy's Eq. J., sec. 1123.

So much for her power over her separate estate.

The next inquiry is : Of what may the separate estate consist? And according to what rule is its nature and extent to be determined and fixed? Is the nature of the estate and the degree of the interest of the married woman in it to be fixed by certain arbitrary rules, which may or may not in the particular case create in her a separate estate to the extent intended by the settler; or is it to be arrived at by the natural and reasonable method of inspecting the instrument creating the estate and discovering the intention of the settler, and then construing the instrument and fixing the character of the estate and the quantity of the interest of the married woman in it according to such intention?

When equity first created the separate estate, the main purpose was no doubt to intercept the marital rights of the husband; but, if it ever restricted the separate estate to such of the property of the married woman as her husband would have been entitled to by virtue of his marital rights at common law, such rule has long since been departed from. "Property of every kind, real or personal, and any interest therein," says Pomeroy in his Equity Jurisprudence, sec. 1103, "may be conveyed, settled, or held to the wife's separate use.

Her equitable separate estate may, therefore, include estates in fee in land, in possession, or reversion, like estates, estates for years, things in action, securities, specific chattels, or money." And not less comprehensive and emphatic is the language of Williams, in his work on Real Property : " Not only the income, but the *corpus* of any property, whether real or personal, may be limited to the separate use of a married woman " (p. 225). See also Bright on Husband and Wife, p. 204.

" It was contended at the bar," said Lord Westbury in *Taylor* v. *Meads*, 4 De Gex, Jones and Smith 597, " that the effect of this devise was to give the married woman an estate to the separate use only during the joint lives of herself and her husband, with remainder in her in fee. But that is not the true construction of the will. The estate given to Elizabeth Meads " (who was the married woman) " is one and entire, being the equitable estate in fee, with a declaration, the effect of which is that her husband shall have no interest in the estate so devised, nor shall the wife be under any disability with respect to such estate by reason of her existing coverture, but shall have the same rights of enjoyment and disposition as if she were a single, and not a married woman."

In *Burging* v. *McDowell et als.*, 30 Gratt. 236, it was held that the married woman took a separate estate in fee in the land under the settlement made upon her, and that her sole deed vested in the purchaser, to whom she had sold and conveyed it, a perfect title.

The equitable separate estate may, therefore, consist of any property, and of any interest therein. It is what the settler intended it to be, according as the intention may be ascertained by the true construction of the instrument by which the trust for the separate use is created, and is not arbitrarily limited to the interest or property covered by the marital rights of the husband at common law.

This brings us to the main question : To what extent and in what manner will a court of equity enforce the general engagements of a married woman against her equitable separate estate ? It has been repeatedly held by this court that, unless the power of alienation by the married woman be restrained by the instrument creating the estate, all the personalty and the rents and profits of all the realty settled to her separate use may be subjected to their payment. As to this there has never been any difficulty, but the controversy has been as to the right to subject the *corpus* of the real estate by · a sale thereof. I can recall no case in which this court has gone so far, and none was cited by counsel in argument.

In the case of *Frank & Adler* v. *Lilienfeld et als.*, 33 Gratt. 399, Judge Burks, in delivering the unanimous opinion of the court, said : " I think the English rule, as stated by Lord Thurlow, is substantially correct ; and, therefore, to satisfy a general engagement of the wife, (and by *general* engagement I here mean an engagement made with reference to her separate estate, so as to make it liable in a general sense, but which does not amount to a *specific lien* of any sort upon such estate,) the personal property, where the interest of the wife is absolute, and there is no restraint upon the alienation of such property imposed by the instrument creating the separate estate, may be sold by the decree of the court, and, under like conditions, the rents and profits of the separate real property may be subjected ; and to that end, following the analogy of the law so far, such real estate may be leased from time to time, by order of the court, until the debt out of the rents be discharged ; but in no case, I think, should the real estate, or any part thereof, be sold to satisfy the debt of the wife, unless such debt be one secured by *specific lien* on such estate, created in a mode which conforms to the mode required for a valid disposition by her of that estate. If the creditor desires to bind the real estate in such

a way as shall authorize the sale for the satisfaction of his debt, let him take the appropriate security within the power of the wife to give. If he fails to do this, equity cannot provide him a security which he has neglected to provide for himself."

I have quoted thus fully from this opinion, because it was concurred in by all the members of the court, and lays down with great accuracy and clearness the rule as to the liability of the equitable separate estate, according to the long course of decision in this State, except that, so far as I am aware, it is the only case in which it is stated that *in no case* should the real estate or any part thereof be sold to satisfy the debt of the wife, unless such debt be one secured by specific lien on such estate. Nevertheless, this court, in the enforcement of the general engagements of the wife, has never gone further than to subject to their payment the personalty and the rents and profits of the realty ; and the doctrine that the *corpus* of the real estate—certainly as a general rule—will not be sold to satisfy the general engagements of a married woman is deeply imbedded in the law of this State. This is sustained by an unbroken line of decisions, many of which are collated in Burks' "Separate Estates," p. 22, note. If we say now that these decisions are all wrong, and that the *corpus* of the real estate may be sold in *all cases*, will not our successors have more right to reverse our decision than we have to reverse those of our predecessors, that may be said to be hoary with age ? These decisions were made by this court when it was composed of judges of eminent ability and learning, and are entitled to the greatest weight and respect. As was said by Chief-Justice Church, in *Yale* v. *Dederer,* 68 N. Y. 335, in delivering the opinion of the Court of Appeals of New York upon a similar question: " It is better to adhere to a rule of doubtful propriety, which has been deliberately settled for a long series of years, and repeatedly

reiterated by all the courts of the State, than, by overturning it, to weaken the authority of judicial decisions, and render the law fluctuating and uncertain." I am aware that there exists a decided difference of opinion among judges and lawyers upon the particular question in controversy here, which makes it all the more proper, if the general rule, so long and so uniformly adhered to by this court, is to be abrogated, that it should be done by legislative power.

But while this court has never gone further than to subject the personalty and the rents and profits of the realty to the payment of the general engagements of the married woman, yet the right to subject them is not confined to the period of the coverture. If these are liable for her debts during the coverture and may be subjected to that end during that period, no good ground is perceived, nor can any valid reason be assigned, why they should not continue to be liable after the termination of the coverture, whether by her own death, or that of her husband, or otherwise, unless the estate is determined by the particular event that terminates the coverture. Once liable, the right to subject it, to the extent of the separate estate, should continue until the debts are discharged.

In *Ropp* v. *Minor et als.*, 33 Gratt. 97, 116, Judge Burks said: "The subsequent discoverture * *. * cannot *per se* give any other or greater force and effect to her prior engagements than they had during the coverture. Such engagements did not bind her personally, either at law or in equity, so as to warrant a personal judgment or decree against her. They affected her separate estate to the extent, and only to the extent, of her then existing powers over it. They had no other operation. Her subsequent discoverture could not, upon any principle known to us, operate by estoppel or otherwise to enlarge the liabilities of that estate imposed by the engagements when entered into." If, in the

creation of the particular separate estate, it was so created that it might extend beyond the period of coverture, the continuance thereafter of its liability for her debts until discharged is not in conflict with what was said in *Ropp* v. *Minor, supra.* Such continuance of liability does not enlarge the estate, or its liability for the debts of the *feme covert,* or her powers over it. These are not enlarged by the discoverture; neither should they be thereby lessened or restrained, but should remain the same. The married woman having the right during the coverture, in the absence of any restraint on her power of alienation, to make her separate estate liable for her general engagements, and having contracted debts on the faith and credit of the estate, and thereby created the right to subject it to their payment, it is equitable and just that such separate estate should continue liable as well after the termination of the coverture as during its existence; and equity, because it is just, will, after the termination of the coverture, as well as during its existence, enforce the right against the estate, or so much of it as may then remain in her ownership. 1 Leading Cases in Equity, 692; *Norton* v. *Turville,* 2 P. Wms. 144; *Gregory* v. *Lockyer,* 6 Madd. 90; *Heatley* v. *Thomas,* 15 Vesey 596; Anonymous, 18 Vesey 258; and 2 Roper on Husband and Wife, 245.

In *Burnett and Wife* v. *Hawpe,* 25 Gratt. 481, the suit was brought, after the termination of the coverture by the death of the husband, against his widow, who had married again, to subject her separate estate to the payment of a debt she had contracted during the coverture with her first husband. Having sold after his death a part of the land settled to her separate use, the purchaser was decreed to pay to the plaintiff the balance he owed her on the land, it being considered a just compensation for the rents and profits that might have accrued from the land if she had not sold it, in satisfaction *pro tanto* of his claim; and an account was

ordered to be taken of her separate personal estate, and the rents and profits of the residue of the lands settled to her separate use, for the purpose of applying the same to the debt of the plaintiff. On appeal to this court, the decree of the lower court was affirmed.

And so in *Leake, Trustee,* v. *Benson,* 29 Gratt. 153, the rents and profits of land, which had been purchased with the proceeds of the sale of the land in which the *feme covert* had an equitable separate estate for her life, were subjected to the payment of debts contracted by her after the termination of the coverture by the death of her husband, and also for debts contracted by her during the coverture as surety for him.

These two cases clearly decide, in the result, that the rents and profits of real estate settled to the separate use, which accrued after the termination of the coverture, were liable to the payment of the general engagements of the married woman entered into by her during the coverture; and refute the contention that the right exists to subject only such as accrue during the coverture, and that the liability of her separate estate for the payment of her debts ceases with the termination of the coverture. It may be said that this question was not raised in those cases, and was not therefore considered by the court. It is true that the precise question does not appear to have been discussed by Judge Staples, who delivered the opinion in each case, but it is not to be presumed that it escaped the attention and consideration of himself and the other able and vigilant judges who then administered justice from this bench.

The settlement in this case was made upon Mrs. Haxall by her mother during the coverture. An examination of the deed of settlement shows that it vested in Mrs. Haxall an equitable separate estate in fee in the real estate. While the deed enumerates certain specific powers (and they are very broad)

which may be exercised by her, it nevertheless contains no negative words restraining her from exercising any other power, nor anything from which restraint on her power of alienation may be properly inferred. She had, therefore, an absolute power of alienation over the estate, and the consequential right to make it liable for her contracts. The debts which are sought to be enforced were all contracted since May 1, 1888, when the present Code went into effect, and she is therefore presumed to have made them with reference to her said separate estate as a source of credit. Besides such presumption, the evidence is express and positive, leaving no room for doubt or question, that she contracted the debts on the faith and credit of her said estate, and intended to bind it for their payment. In accordance with the principles applicable to equitable separate estates, as hereinbefore set forth, her creditors had the right to ask that the rents and profits of the real estate be applied to their payment. But when we seek to apply the general rule, we are confronted with this difficulty, that the annual rents and profits are insufficient to discharge the interest annually accruing on the debts. From which it follows that the debts will go on increasing and the creditors be entitled to receive the rents and profits of the land forever. Such a result would be unjust both to the creditors and also to the devisees of Mrs. Haxall; the former would never be able to obtain satisfaction of their debts, and the latter could never have any enjoyment of the property. The subjection of the rents and profits of the realty merely in such case would be a wholly ineffectual remedy, while a sale would be beneficial to all the parties. It is characteristic of equity that it will mould its remedies, as far as consistent with the rights of the parties, to meet the exigency of the case. Where such a state of facts exists as here, a court of equity will, upon the principle of accelerating the remedy, decree a sale of the land, the rents

and profits whereof would otherwise, under the general rule, be subjected to the payment of the debts.

Indeed, we are not without precedent in this respect. At common law lands of the debtor could not be taken to satisfy his debts, except judgments due to the king, and judgments did not therefore operate as *liens* on land; but, by the statute, (Westm. 2, 13 Edw. I., ch. 18,) a new execution was provided, the writ of *elegit*, which enabled the creditor to *extend* a moiety of the lands of the debtor, either in his own hands, or in the hands of a purchaser, or of the heir, to satisfy the judgment, which, by the judicial construction given to the writ, was said to be a lien on the land. *Borst* v. *Nalle et als.*, 28 Gratt. 423, 428, and *Stileman* v. *Ashdown*, 2 Atkyn's Rep. 608; *S. C.*, Ambler 13. But while the writ gave the creditor the right to take the rents and profits of a moiety of the land at an estimated annual value until his debt was satisfied, yet it was held, Lord Hardwicke leading the way in *Stileman* v. *Ashdown, supra*, and Lord·Redesdale following in *O'Gorman* v. *Comyn*, 2 Sch. & Lef. 138, that a court of equity, where the rents and profits would not pay the judgment within a reasonable time, would sell a moiety of the land, and apply the proceeds of sale to the payment of the debt; and that whilst equity could not change the rights of the parties, yet it would accelerate the payment of the judgment by directing a sale of a moiety of the land, to the rents and profits of which the creditor was only entitled under his writ of *elegit*, and not compel him to await the tedious operation of its discharge out of the annual rents and profits. See also 2 Robinson's (old) Practice 46; 2 Story's Eq. J., sec. 1216 (*a* and *c*); *Curtis* v. *Curtis*, 2 Bro. C. C. 634; *Blow* v. *Maynard*, 2 Leigh 29; *Tennent's Heirs* v. *Pattons*, 6 Leigh 179, 196, and *Burton* v. *Smith et al.*, 13 Peters 464.

The only difference between that class of cases and the one before us is that in that case equity was asked to enforce a

judgment that was a legal lien, and in this case its juris-
diction is invoked to enforce an equitable liability, both being
confined to the rents and profits of the real estate, but it
being peculiarly the province of equity to enforce the latter
against the separate estate, which is its own creation.

The principle which justified a sale of a moiety of the land
in the cases decided by Lords Hardwicke and Redesdale
applies with all its force to the case before the court. I am
of opinion, therefore, that, where there is no equitable sepa-
rate personal estate of the wife applicable to the discharge of
her general engagements, or, if so, that it is insufficient for
that purpose, and the rents and profits of the real estate con-
stituting her equitable separate estate will never discharge
the debts, or not do so within a reasonable time, it is proper
to decree a sale of the land for that purpose, and that to this
extent the general rule laid down in the case of *Frank &
Adler* v. *Lilienfeld et als.*, *supra*, should be qualified.

What is reasonable time is a matter of discretion of every-
day's occurrence in courts of equity. In respect to this
matter, they might well adopt, as a general rule, by way of
analogy to the law, the period which the Legislature, in the
statute regulating the enforcement of judgment liens in
equity, has, in its wisdom, fixed as a reasonable time within
which, if the rents and profits will discharge the judgment,
the land should not be sold. Code of Va., sec. 3571; Report
of Revisors (1849), p. 918.

For the foregoing reasons, I am of opinion that there is no
error in the decree of the Chancery Court in directing, under
the particular circumstances of this case, a sale instead of the
renting of the real estate, and am, therefore, for affirming the
same.

KEITH, P., and CARDWELL and HARRISON, JJ., concur in
the opinion of RIELY, J.

BUCHANAN, J., dissenting :

I regret that I am unable to concur in the opinion of the court.

The principles which ought to control in the decision of this case, in my judgment, have been recognized and acted upon for nearly three-quarters of a century, in a long line of decisions, beginning with *West* v. *West*, reported in 3 Rand. 373, and coming down to *Taylor* v. *Cussen*, 90 Va. 40. This court has never recognized the right of a creditor of a married woman to subject the *corpus* of her equitable separate real estate to the payment of her general engagements during coverture, but such right, whenever asserted, has always been denied.

How the death of the wife can, upon any principle of law, enlarge such a creditor's rights, and enable him to subject, after her death, property which he had no right to subject during her coverture, I am utterly unable to understand. No reason has been, or, in my judgment, can be, given for the exercise of such a right after her death which does not apply with equal force during coverture.

The principle involved in both cases is the same.

The necessary effect of this decision·is, therefore, to overturn a rule of law imbedded in our decisions, and which has become a rule of property, and thus disturb vested rights.

If the rule of law governing this court in its former decisions is founded upon incorrect principles, and fails to accomplish fully the ends of justice, the remedy is with the Legislature. Laws by that body operate prospectively only, whilst laws made by the court operate retrospectively as well as prospectively, and are subject to the double objection that they are made without authority and disturb vested rights.

*Affirmed.*